ALEXANDER (ZANDER) BLEWETT III
ANDERS BLEWETT
DREW BLEWETT
HOYT & BLEWETT PLLC
P.O. Box 2807
Great Falls, MT   59403-2807
Telephone: (406) 761-1960
Fax: (406) 761-7186
E-mail: zblewett@hoytandblewett.com
        ablewett@hoytandblewett.com
        dblewett@hoytandblewett.com

Attorneys for Plaintiff

**FILED**

6/25/2024

Clerk, U.S. District Court
District of Montana
Billings Division

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| KAYLEI DINGER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF NOAH DINGER, ) ) ) | Cause No.: **CV-24-77-BLG-SPW-TJC** |
| ) | Hon. |
| Plaintiff, ) | |
| ) | **COMPLAINT AND DEMAND** |
| v. ) | **FOR JURY TRIAL** |
| ) | |
| SIBANYE STILLWATER LIMITED, and STILLWATER MINING COMPANY ) ) ) | |
| ) | |
| Defendants. ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COMES NOW the above-named Plaintiff, Kaylei Dinger, as Personal Representative of the Estate of Noah Dinger, by and through her attorneys of record, and for her claims against Defendants, alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, Kaylei Dinger, is the duly appointed and acting Personal Representative (PR) of the Estate of Noah Dinger, who died on 11/13/23 while working at the Stillwater Mine in Nye, Montana.  On 5/7/24, Plaintiff was appointed as PR of the Estate of Noah Dinger in Kootenai County, ID.  On 6/24/24, Plaintiff was identified as the domiciliary foreign PR of the Estate of

Noah Dinger in Montana's Twenty Second Judicial District Court, Stillwater County.  As the domiciliary foreign PR of the Estate of Noah Dinger, Plaintiff, pursuant to § 72-4-310, MCA, is entitled to exercise all powers of a local PR and may maintain actions and proceedings in the State of Montana, subject to any conditions imposed upon nonresident parties generally.

2.      At the time of his death on 11/13/23, Noah Dinger was a citizen of the State of Idaho, and was at all times material herein, a resident of Post Falls, Idaho.  Plaintiff, as PR of the Estate of Noah Dinger, is a citizen of the State of Idaho and was at all times material herein, a resident of Post Falls, Idaho.

3.      Defendant, Sibanye Stillwater Limited (SSL), is a foreign corporation incorporated in the Republic of South Africa and is the parent company of Defendant Stillwater Mining Company.  SSL operates the Stillwater Mine, a platinum and palladium underground mine in Nye, Stillwater County, Montana.

4.      Defendant, Stillwater Mining Company (SMC), is a foreign corporation and is a citizen of the State of Delaware.  SMC, along with SSL, operates the Stillwater Mine, a platinum and palladium underground mine in Nye, Stillwater County, Montana.  These two entities, SSL and SMC, will be referred to collectively as SSL/SMC.

5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332, diversity of citizenship, since the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.

6.      Venue for this action is proper in the Billings Division of this Court pursuant to § 25-2-122(1)(b), MCA, because the tort giving rise to Noah Dinger's injury and subsequent wrongful death was committed in Stillwater County, Montana.

## GENERAL ALLEGATIONS

7.      Plaintiff realleges the allegations contained in ¶¶ 1-6.

8.      SSL is a multinational mining and metals processing group with a

diverse portfolio of operations, projects and investments across five continents.

9.    SSL has established itself as one of the world's largest primary producers of platinum, palladium, and rhodium and is a top tier gold producer. SSL also produces and refines iridium and ruthenium, nickel, chrome, copper and cobalt.

10.    SSL is engaged in the development, extraction and processing of platinum group metals (PGMs) from a geological formation in south-central Montana known as the J-M Reef, which is the only known significant source of PGMs in the US and the highest-grade PGM deposit known in the world.

11.    On its website, SSL represents to the world, "At Sibanye-Stillwater, safety is a core value and our top priority.  We are committed to minimizing exposure to risk and driving continuous improvement through the US Region's GET (Guide, Educate and Train) Safety and Health Management System. Working together, our leadership and employees ensure everyone goes home safe today."

12.    In a policy statement titled "Safety and Health" on its website dated 3/12/21, SSL represents to the world, "Sibanye-Stillwater strives for zero harm at its operations.  The Company aims to eliminate the potential for fatalities, accidents and injury at the workplace and strives to minimise (sic) hazards inherent in the working environment in a reasonably practicable manner through implementation of the Health, Safety and Wellbeing strategy and embracing the CARES values."

13.    In the policy statement titled "Safety and Health" on its website from 3/12/21, SSL represents to the world that SSL is committed to the following:

-Providing a workplace that is conducive to safe production.

-Risk management in the workplace and surveillance of workplaces and employees.

-Fostering a strong safety culture by providing solid safe production

leadership.

-Ensuring that appropriate resources, training and personal protective equipment are provided to improve occupational health and safety.

-Ensuring that employees and contractors have the relevant skills to perform work related tasks in a safe manner and that they are aware of their individual occupational health and safety obligations and rights.

-Maintain strong safety systems, standards, procedures and critical controls.

14.     In the policy statement titled "Safety and Health" on its website from 3/12/21, SSL also represents to the world, "Employees and contractors working on Sibanye-Stillwater operations play a fundamental role in achieving occupational health and safety objectives through their right to work in an environment where health risks are reduced and their duty to withdraw from and report an unreasonably unhealthy or dangerous situation."

15.     In April 2023, SSL issued its 2022 Integrated Report which is a 291 page report created by SSL that describes the progress of SSL in delivering on its strategy, purpose and vision.  A link to SSL's 2022 Integrated Report is posted on SSL's website.  On page 2 of its 2022 Integrated Report, SSL represents to the world, "This Integrated report (report) describes the progress of Sibanye Stillwater Limited (Sibanye-Stillwater or the Group) in delivering on its strategy, purpose and vision. It shows how we create and preserve value for our stakeholders over the short, medium and long term, across the six capitals: human, financial, intellectual, natural, manufactured, social and relationship, noting that value creation in some areas can lead to value erosion in others. This report also includes all relevant and material information where our activities eroded value."

16.     On page 34 of SSL's 2022 Integrated Report, SSL represents to the world, "We acknowledge that working at depth, with heavy machinery, presents risks to life and limb; therefore we prioritise (sic) all practical, technical and behavioural (sic) measures to reduce safety and health risks to near zero."

4

17.     On page 71 of SSL's 2022 Integrated Report, SSL represents to the world, "Processing and particularly underground mining involve (rock mass management, high temperatures, equipment and/or people intensive). Therefore, it is crucial that we focus on real risk reduction and blocking the path to death. The Zero Harm framework has a risk approach that includes institutionalising (sic) our controls, behaviours (sic) and management routines."

18.     On page 126 of SSL's 2022 Integrated Report, SSL represents to the world, "We are committed to maintaining a working environment that is safe and that fosters the health and well being of its employees and contractors...Ensuring safety and well being is a strategic essential to our business. Mining and processing activities present various hazards that can be of significant consequence to our workers. Continuously improving our safety performance, through risk mitigation, is vital and we remain committed to eliminating fatal accidents and achieving our goal of Zero harm."

19.     On page 128 of SSL's 2022 Integrated Report, SSL represents to the world that in 2022, SSL's health and safety focus was on the elimination of fatalities in its operations and the management and mitigation of high-potential incidents (HPIs).  Following 21 fatal incidents in 2021, SSL's safety priority shifted focus from total recordable injury frequency rate (TRIFR) to prioritizing the elimination of fatalities, encapsulated in a fatal elimination strategy. The fatal elimination strategy was formulated on fundamental risk management practices to mitigate against high-energy risks in its operations.  The strategy was benchmarked against global industry best practice and its effectiveness was reviewed by an independent third-party safety expert, Stephen Eichstadt.

20.     On page 128 of SSL's 2022 Integrated Report, SSL goes on to represent to the world, "Despite a significant year on year improvement in all safety metrics, the tragic loss of life in 2022, where five of our colleagues passed away in mine related incidents, is a reminder that we still have a journey to travel

to sustainably eliminate fatal incidents from our operations. Our sincere condolences go to the families and friends of our departed colleagues."

21.    On page 129 of SSL's 2022 Integrated Report, SSL represents to the world that the fatal elimination strategy was essentially a culture change initiative driven throughout SSL's operations that requires management teams to continually assess the appropriateness and effective implementation of SSL's critical controls to reduce risk but also to understand the reason for unsafe behavior.

22.    In February 2020, SSL was accepted as a member of the International Council on Mining and Metals (ICMM).  ICMM is an industry body that plays a global leadership role in sustainable development.  Its membership includes a third of the global metals and mining industry, dedicated to leadership, action and innovation for a safe, just and sustainable world.  ICMM members recognize that they have an active role to play in creating a safer and more sustainable mining and metals industry.

23.    In January 2022, ICMM published a brief titled "An Approach to Contractor Engagement" which states in pertinent part:

> This brief provides a high-level perspective on contractor engagement in the mining and metals sector with the aim of promoting a move from 'service providers' to a 'delivery partner' model for contractor management. It includes an 8-step process for contractor engagement and a maturity framework that can be used to identify how companies are currently engaging with contractors, help map the path towards a 'delivery partner model' and enable companies to understand underlying socio-organisational aspects related to the development of a positive, 2-way, partnering relationship between companies and contractors.
>
> ICMM members share an unwavering commitment to the health and safety of their workers and are working to eliminate fatalities, towards a goal of zero harm.  A large proportion of these workers are contractors.
>
> In many cases, a company hires a contractor or service provider to perform a service that the company does not have the expertise or resources to perform. In those situations, the contractor or service provider hired is assuming the risks associated with the service.  However, simply hiring a contractor to perform a service does not absolve the hiring company of the obligation to provide a healthy and safe place of work.  There is a range of complexity when it comes to the work being undertaken by contractors

which can impact the level of detail and maturity needed to ensure the right health and safety outcomes are maintained. However, this should not distract from the overall need to maintain and continually improve process and performance to get to the goal of zero harm.

Inefficient, incomplete or inconsistent contractor management practices greatly increase the risk of costly delays, mistakes, and hazards to health, safety, equipment and the environment. At worst, this can lead to serious injury or death of workers and can irrevocably damage corporate reputation.

24.    On its website, ICMM promotes the following with regard to the safety commitments of its company members, including SSL:

Each of our company members – which together account for one-third of the global industry – commits to implementing the Mining Principles as a condition of membership. These principles are neither static nor do they represent the ceiling of our ambition. We are always challenging ourselves to go ever further in setting the highest of standards for responsible mining, and delivery.

Responsible mining companies have an unwavering commitment to the health and safety of workers and their families, local communities and wider society. ICMM members adopt workplace practices and critical controls to prevent fatalities, minimize injuries and eliminate occupational diseases, towards a goal of zero harm.

For ICMM member companies, any harm is unacceptable. While mining is an inherently hazardous activity, this does not mean that accidents are inevitable. Health and safety are core values guiding an unwavering commitment to the wellbeing of workers, their families, communities and wider society.

ICMM members have an unwavering commitment to the health and safety of their workers and work unceasingly for the elimination of fatalities and preventable injuries. Despite this, zero harm is still an unachieved goal...

25.    On page 128 of SSL's 2022 Integrated Report, SSL represents to the world that during 2022, SSL adopted ICMM's safety reporting protocols, including integrating ICMM's safety definitions into SSL's critical controls.  SSL is an active participant in the ICMM Health and Safety working group and has provided the working group with an update on progress made towards its fatal elimination strategy.

26.    In April 2024, SSL issued its 2023 Integrated Report which is a 298 page report created by SSL that describes the progress of SSL in delivering on its strategy, purpose and vision.  A link to SSL's 2023 Integrated Report is posted on

SSL's website.  On page 13 of SSL's 2023 Integrated Report, SSL represents to the world:

> Regrettably, we experienced an increase in fatalities at our mines, with eleven colleagues losing their lives while on duty. The increase in fatalities is deeply concerning for management and the Board and is receiving intensified attention. We extend our heartfelt condolences to the loved ones, family and friends of those who passed.
>
> The 11 fatalities included five contractors. Among these, four contractors were fatally injured in a single incident at Burnstone due to a design fault in the conveyor structure they were working on.  The Conveyor will be reconstructed in due course with a new design factoring in new learnings.
>
> <u>Implementing critical controls and critical lifesaving behaviours (sic) is core to our safety strategy to eliminate fatal incidents and achieve our aspiration of Zero harm</u>...

27.    On page 125 of its 2023 Integrated Report, SSL goes on to represent to the world:

> <u>Protecting the safety and health of our employees and stakeholders is our primary objective</u>. Our approach to health and safety is underpinned by our iCARES values and is a strategic essential to our business. <u>We remain committed to eliminating fatal incidents and achieving our goal of Zero harm</u>. Implementing critical controls and critical lifesaving behaviours (sic) is core to our safety strategy. Such interventions have been essential to the progress towards reducing the risks associated with fatal and serious injuries<u>. Through compliance, we aim to block the path to death and mine without fatalities</u>...

28.    On page 126 of its 2023 Integrated Report, SSL goes on to represent to the world:

> <u>Zero harm is our ultimate objective, but the immediate goal is to eliminate high-energy fatals (these relate to high energy source incidents such as fall of ground, mobile equipment related) and serious incidents through our Fatal elimination strategy</u>. This strategy is comprised of the three key pillars: critical controls, critical life saving behaviours (sic), and critical management routines. <u>We are dedicated to embedding an operational safety culture that enables our teams to work to standards and to stop any unsafe work without hesitation</u>...

We are active participants in the ICMM Health and Safety working group. We regularly compare our standards against third-party benchmarks. Our operations in the SA region and the US region are ISO 45001 certified, as is Sandouville refinery.

29.    On page 127 of its 2023 Integrated Report, SSL goes on to represent to the world:

Eliminating fatal incidents was the primary focus in 2023 and the immediate priority in achieving our "culture of care", through which we enhance safety, health, and overall wellbeing. We continued with our Fatal elimination strategy, with the focus on preventing high-energy risks and high-potential incidents (HPIs) in our operations. The strategy is benchmarked against global best practice and was reviewed by an independent safety expert.

In 2023, eleven of our colleagues tragically lost their lives in eight mine related incidents. We are truly saddened at the loss, and our deepest condolences go out to family and friends of the deceased. The most serious incident, in which four contractors lost their lives, involved the collapse of a newly constructed surface waste rock conveyor at the Burnstone project at the SA gold operations.

Senior leadership, with guidance from our safety professionals, have developed and implemented comprehensive safety initiatives (systems and programmes (sic)) that are benchmarked against ICMM peers and integrate industry-leading practices...

To achieve the goal of zero fatalities we are dedicated to "blocking the path to death" in all workplaces all the time. This requires that we identify workplace areas that have a risk for high energy incidents, that we implement controls to mitigate these risks, and that we influence the behaviour (sic) of employees and the culture of the organisation (sic) toward risk mitigation and avoidance.

30.    On page 135 of its 2023 Integrated Report, SSL goes on to represent to the world:

The key safety focus for 2024 will remain on the three pillars of the Zero harm strategic framework: enabling environment, empowered people, world class systems, with the following overarching objectives:

• Everyone takes responsibility to reduce risk, with line management

ultimately accountable for real risk reduction and promoting the desired safety culture in their operations

• <u>VPs are accountable for embedding the fatal elimination strategy at their operations and for addressing organisational (sic) culture and behaviour (sic)</u>

• Improved reporting and data analysis to allow for informed decision-making and targeted interventions, enhancing continuous learning and improvement

• Setting our supervisors up for success through critical behavioural (sic) skills and leadership work routines

• Reinforcing the belief across the organisation (sic) that "I can do my work safely, all of the time, without getting injured"

31.    On page 181 of its 2023 Integrated Report, SSL goes on to represent to the world:

<u>Safety lapses at our operations are most regrettable, indeed tragic for those who have lost loved ones. Every fatal accident has a profound impact on the families and friends of those lost.</u> Each serious incident is being investigated and analysed (sic) at the highest level. We are supportive of and encouraged by the efforts of our safety champions as they drive the campaign of Zero harm and the Fatal elimination strategy. <u>The Social, Ethics and Sustainability Committee is playing its supportive part in embedding the Group minimum standards, and a culture of personal responsibility and empowerment, especially for frontline teams, when it comes to stopping work in unsafe conditions.</u>

32.    On page 226 of its 2023 Integrated Report, SSL goes on to represent to the world:

Elimination of fatal incidents remain the focus and the immediate priority in achieving our culture of care. Despite our efforts eleven fatalities still occurred at our operations in 2023. <u>We remain dedicated to embedding an operational safety culture that enables our teams to work to standards and block the path to death and mine without fatalities.</u>

33.    On page 288 of its 2023 Integrated Report, SSL goes on to represent to the world:

<u>Underground mining involves the management of serious risk to life and health: falling ground, large vehicles, dangerous equipment, and the like. It is crucial that we focus on real risk reduction and blocking the path to death</u>. The Zero harm framework has a risk approach that includes institutionalising (sic) our controls, behaviours (sic) and management routines. Part of having safety as a material matter is creating a psychologically safe working environment, with due consideration being given to mental health, and to occupational health and wellbeing.

34.     The Stillwater Mine operated by SSL/SMC has two principal mining sections: the Western section, which has been in operation since 1986, produces approximately 250-300koz 2E per annum of platinum and palladium in concentrate; and the Stillwater East section, which is still in a buildup phase. The Western section of the operation is accessed by a 580m deep shaft and five surface portals, while Stillwater East is accessed via three portal drives.  The Stillwater Mine employs approximately 1,100 miners and operates two, 12-hour production shifts, seven days per week.  SSL/SMC uses load haul dump loaders, underground trucks, and underground rail haulage to transport the ore to the surface.

35.     The Federal Mine Safety and Health Act, set forth under 30 U.S.C. § 801, applies to all mine operators and miners in the United States, including the Stillwater Mine operated by SSL/SMC.  30 U.S.C. § 801 states:

Congress declares that—

(a) the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner;

(b) deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal or other mines cause grief and suffering to the miners and to their families;

(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death

and serious physical harm, and in order to prevent occupational diseases originating in such mines;

(d) the existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated;

(e) the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines;

(f) the disruption of production and the loss of income to operators and miners as a result of coal or other mine accidents or occupationally caused diseases unduly impedes and burdens commerce; and

(g) it is the purpose of this chapter (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health and Human Services and the Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal or other miners; (2) to require that each operator of a coal or other mine and every miner in such mine comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State coal or other mine health and safety programs; and (4) to improve and expand, in cooperation with the States and the coal or other mining industry, research and development and training programs aimed at preventing coal or other mine accidents and occupationally caused diseases in the industry.

36.    Pursuant to 30 CFR § 56.18020 and 30 CFR § 77.1700, both of which are safety standards promulgated under the authority of the Federal Mine Safety and Health Act, no employee shall be assigned, or allowed, or be required to perform work alone in any area where hazardous conditions exist that would endanger his safety unless he can communicate with others, can be heard, or can be seen.

37.     Pursuant to 30 CFR § 56.18025, which is another safety standard promulgated under the authority of the Federal Mine Safety and Health Act, no employee shall be assigned, or allowed, or be required to perform work alone in any area where hazardous conditions exist that would endanger his safety unless his cries for help can be heard or he can be seen.

38.     In *Gibby v. Noranda Minerals Corp.*, 273 Mont. 420, 905 P.2d 126 (1995), the Montana Supreme Court held that a mining company, which retained a contractor to drill an exploration tunnel, owed a nondelegable duty of safety to the contractor's employee and also owed a nondelegable duty to follow safety standards promulgated under the authority of the Federal Mine Safety and Health Act, and violation of such standards was evidence of negligence.

39.     The Court in *Gibby* held that the purpose of the Federal Mine Safety and Health Act is the protection of life, the promotion of health and safety, and the prevention of accidents, and that pursuant to the Federal Mine Safety and Health Act, the mining company had a nondelegable duty to:

(1) correct hazardous conditions at the mine (30 CFR § 57.3200);

(2) provide experienced persons to examine ground conditions, haulage ways, travel ways, and surface areas both prior to commencement of work and periodically during performance of work in the mine (30 CFR § 57.3401);

(3) inspect equipment and correct defects in the equipment, machinery, and tools that affect safety to prevent the creation of hazards to persons working in the mine (30 CFR § 57.141000);

(4) prohibit use of machinery, equipment, and tools beyond the design capacity intended by the manufacturer, where such use may create a hazard to persons (30 CFR § 57.14205);

(5) provide a competent person designated to examine each working place at least once each shift for conditions which may adversely affect safety or

health and initiate

appropriate action to correct such conditions (30 CFR § 57.18002); and,

(6) initiate appropriate action to correct such conditions (30 CFR § 57.18002).

40.    In February 2020, SSL/SMC entered into a Master Agreement with Moran Mining Group (Moran) for the work Moran was to perform as a contractor at the Stillwater Mine.  Moran is a mining contractor headquartered in Canada with operations in the United States.  Moran employs 62 miners at the Stillwater Mine where it contracts to perform development work and Alimak raise mining. All of SSL's safety commitments and/or representations to the world, which included Moran, set forth above, were an integral part of the Master Agreement between SSL/SMC and Moran.

41.    On 11/13/23, Noah Dinger, who was an employee of Moran, was working at the Stillwater Mine operating a 2022 Komatsu ZB21 underground hard rock roof bolter (Komatsu bolter).  While operating the Komatsu bolter, Noah Dinger was working alone in an area where hazardous conditions existed that endangered his safety, and he was unable to communicate with others and could not be heard or seen.

42.    While working alone and operating the Komatsu bolter, Noah Dinger was forced to exit the operator's compartment of the Komatsu bolter to change the drill steel.  The practice of exiting the operator's compartment to change the drill steel is very common and is something which underground miners do on a regular basis at the Stillwater Mine.  Given the frequency and regularity with which underground miners exit the operator's compartment to change the drill steel, SSL/SMC was well aware of this common practice at the Stillwater Mine and did nothing to prevent it from occurring.

43.    After Noah Dinger was forced to exit the operator's compartment of the Komatsu bolter to change the drill steel, his clothing became entangled in the

14

drill steel, and he suffered fatal injuries after surviving an appreciable period of time.

44.    On 6/18/23, five months prior to Noah Dinger's injury and subsequent death on 11/13/23, another miner working at the Stillwater Mine exited the operator's compartment of a rock bolter and suffered an amputation of his right index finger at the second joint and a fractured right arm when his right arm and/or hand became entangled in the drill steel.

45.    Despite the fact that another miner had been seriously injured at the Stillwater Mine on 6/18/23 after exiting the operator's compartment of a rock bolter to change the drill steel and/or for other reasons, SSL/SMC negligently permitted this practice to continue at the Stillwater Mine for an additional 5 months up through the date of Noah Dinger's injury and subsequent death on 11/13/23.

46.    Despite the fact that another miner had been seriously injured at the Stillwater Mine on 6/18/23 after exiting the operator's compartment of a rock bolter to change the drill steel and/or for other reasons, SSL/SMC negligently failed to ensure there were two miners to change the drill steel and/or otherwise operate the Komatsu bolter.

47.    Despite the fact that another miner had been seriously injured at the Stillwater Mine on 6/18/23 after exiting the operator's compartment of a rock bolter to change the drill steel and/or for other reasons, SSL/SMC negligently failed to ensure there was signage located at the front jacks of the Komatsu bolter restricting access while the drill is energized.

48.    Despite the fact that another miner had been seriously injured at the Stillwater Mine on 6/18/23 after exiting the operator's compartment of a rock bolter to change the drill steel and/or for other reasons, SSL/SMC negligently failed to ensure the Komatsu bolter was equipped with an electronic barrier that will de-energize the Komatsu bolter automatically.

49.     SSL/SMC negligently failed to ensure that Noah Dinger was properly trained with regard to changing the drill steel and/or otherwise operating the Komatsu bolter.

50.     At the time of his injury and subsequent death on 11/13/23, Defendants negligently permitted Noah Dinger to work alone in direct violation of 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025 despite the fact that Noah Dinger was working in an area where hazardous conditions existed that endangered his safety, and he was unable to communicate with others and could not be heard or seen.

51.     If Noah Dinger had not been working alone on 11/13/23, the incident resulting in his injury and subsequent death would not have occurred.

52.     Prior to Noah Dinger's injury and subsequent death on 11/13/23, there were 5 separate incidents at the Stillwater Mine in 2023 in which miners were seriously injured while operating a rock bolter.  As evidenced by these prior incidents in 2023, the work Noah Dinger was performing at the time of his injury and subsequent death on 11/13/23 was hazardous and endangered his safety.

53.     Pursuant to section 11.3 of the Master Agreement between SSL/SMC and Moran, Moran was required, at its own expense, to comply with, and require all of its subcontractors to comply with SSL/SMC's safety and health standards referred to as "SMC Safety Procedures".  A copy of the SMC Safety Procedures was attached to the Master Agreement as a Google Drive document.

54.     Prior to the filing of this lawsuit, Plaintiff contacted SSL/SMC's legal counsel and requested that SSL/SMC provide Plaintiff with a copy of the SMC Safety Procedures that was attached to the Master Agreement between SSL/SMC and Moran.  SSL/SMC refused to produce a copy of the SMC Safety Procedures in response to Plaintiff's request.

55.     Prior to the filing of this lawsuit, Plaintiff also contacted Moran's legal counsel and requested that Moran provide Plaintiff with a copy of the SMC

Safety Procedures that was attached to the Master Agreement between SSL/SMC and Moran.  Moran refused to produce a copy of the SMC Safety Procedures in response to Plaintiff's request.

56.    Pursuant to the Federal Mine Safety and Health Act set forth under 30 U.S.C. § 801 and the safety standards promulgated under the Federal Mine Safety and Health Act set forth in the Code of Federal Regulations, SSL/SMC owed a nondelegable duty of safety to Moran's employees, including Noah Dinger.

57.    The Federal Mine Safety and Health Act states in pertinent part, "The first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner", and "The operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines".  Pursuant to these provisions of the Federal Mine Safety and Health Act, SSL/SMC owed a nondelegable duty of safety to Moran's employees, including Noah Dinger.

58.    Pursuant to SSL's safety commitments and/or representations set forth on SSL's website and in SSL's 2022 and 2023 Integrated Reports, SSL/SMC owed a contractual nondelegable duty of safety to Moran's employees, including Noah Dinger.

59.    Pursuant to SSL's membership in ICMM and ICMM's safety commitments and/or representations of its company members, SSL/SMC owed a contractual nondelegable duty of safety to Moran's employees, including Noah Dinger.

60.    Pursuant to the SMC Safety Procedures that both SSL/SMC and Moran refused to produce to Plaintiff prior to the filing of this lawsuit, SSL/SMC retained both the right and duty to control job safety at the Stillwater Mine giving rise to a nondelegable duty of safety on the part of SSL/SMC.

61.    The SMC Safety Procedures that both SSL/SMC and Moran refused

to produce to Plaintiff prior to the filing of this lawsuit imposed a nondelegable duty on the part of SSL/SMC to provide a safe place to work for Moran's employees, including Noah Dinger.

62.     After assuming a contractual nondelegeable duty of safety and an otherwise nondelegeable duty of safety to Moran's employees, including Noah Dinger, SSL/SMC improperly attempted to delegate that duty of safety to Moran even though that duty was nondelegable.

63.     Pursuant to § 39-71-411, MCA, Moran, as Noah Dinger's employer, provided workers compensation coverage for Noah Dinger, and thus Moran is immune from liability.  Because Moran provided workers compensation coverage for Noah Dinger and is immune from liability under § 39-71-411, MCA, SSL/SMC is statutorily prohibited pursuant to § 27-1-703(6)(c)(i), MCA, from blaming Moran for causing Noah Dinger's injury and subsequent death and/or presenting any evidence that Moran was allegedly negligent in causing Noah Dinger's injury and subsequent death.

### COUNT I-WRONGFUL DEATH CLAIM BASED ON DIRECT NEGLIGENCE AGAINST DEFENDANTS SSL AND SMC

64.     Plaintiff realleges the allegations contained in ¶¶ 1-63.

65.     Pursuant to the Federal Mine Safety and Health Act set forth under 30 U.S.C. § 801 and the safety standards promulgated under the Federal Mine Safety and Health Act set forth in the Code of Federal Regulations, SSL/SMC owed a nondelegable duty of safety to Moran's employees, including Noah Dinger.

66.     The Federal Mine Safety and Health Act states in pertinent part, "The first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource—the miner", and "The operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines".  Pursuant to these provisions of the Federal Mine Safety and Health Act, SSL/SMC owed a

nondelegable duty of safety to Moran's employees, including Noah Dinger.

67.    Pursuant to the Montana Supreme Court's decision in *Gibby*, SSL/SMC owed a nondelegable duty of safety to Noah Dinger and also owed a nondelegable duty to Noah Dinger to follow safety standards promulgated under the authority of the Federal Mine Safety and Health Act.

68.    Several of the applicable safety standards promulgated under the authority of the Federal Mine Safety and Health Act which give rise to a nondelegable duty on the part of SSL/SMC include, but are not limited to, 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025, all of which pertain to prohibitions on working alone in an area where hazardous conditions exist that endanger his or her safety.

69.    At the time of Noah Dinger's injury and subsequent death on 11/13/23, SSL/SMC negligently permitted Noah Dinger to work alone in direct violation of 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025 despite the fact that Noah Dinger was working in an area where hazardous conditions existed that endangered his safety, and he was unable to communicate with others and could not be heard or seen.

70.    In negligently permitting Noah Dinger to work alone at the time of his injury and subsequent death on 11/13/23 in direct violation of 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025, and in other particulars, SSL/SMC breached its nondelegable duty to follow safety standards promulgated under the authority of the Federal Mine Safety and Health Act.

71.    As a result of SSL/SMC's negligence in allowing Noah Dinger to work alone in direct violation of 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025 and other negligence, Noah Dinger's clothing became entangled in the drill steel on the Komatsu bolter, and he suffered fatal injuries after surviving an appreciable period of time.

72.    Pursuant to the SMC Safety Procedures that both SSL/SMC and

Moran refused to produce to Plaintiff prior to the filing of this lawsuit, SSL/SMC retained both the right and duty to control job safety at the Stillwater Mine giving rise to a nondelegable duty of safety on the part of SSL/SMC.

73.    SSL/SMC had a nondelegable duty to provide Noah Dinger with a safe place to work under § 50-71-201, MCA. This nondelegable duty required: (1) that SSL/SMC furnish a place of employment that is reasonably safe for all persons working in the Stillwater Mine, including Noah Dinger; (2) that SSL/SMC adopt and use practices, means, methods, operations and processes that are reasonably adequate to render the Stillwater Mine safe; (3) that SSL/SMC do any other thing reasonably necessary to protect the life, health and safety of Moran employees working in the Stillwater Mine, including Noah Dinger; (4) that SSL/SMC never permit persons working at the Stillwater Mine, including Moran employees such as Noah Dinger, to work alone in an area where hazardous conditions exist that endanger his or her safety; (5) that SSL/SMC ensure there were two miners to change the drill steel and/or otherwise operate the Komatsu bolter; (6) that SSL/SMC ensure there was signage located at the front jacks of the Komatsu bolter restricting access while the drill is energized; (7) that SSL/SMC ensure the Komatsu bolter was equipped with an electronic barrier that will de-energize the Komatsu bolter automatically; and (8) that SSL/SMC ensure that persons working at the Stillwater Mine, including Moran employees such as Noah Dinger, were properly trained to change the drill steel and/or otherwise operate the Komatsu bolter.

74.    SSL/SMC breached its nondelegable duty of safety in the following respects and in other particulars:

1)    SSL/SMC negligently permitted Noah Dinger to work alone in direct violation of 30 CFR § 56.18020, 30 CFR § 77.1700, and 30 CFR § 56.18025 despite the fact that Noah Dinger was working in an area where hazardous conditions existed that endangered his safety, and he

was unable to communicate with others and could not be heard or seen;

2) SSL/SMC negligently failed to furnish a place of employment that was reasonably safe for all persons working in the Stillwater Mine, including Noah Dinger;

3) SSL/SMC negligently failed to adopt and use practices, means, methods, operations and processes that are reasonably adequate to render the Stillwater Mine safe;

4) SSL/SMC negligently failed to do what was reasonably necessary to protect the life, health and safety of Moran employees working in the Stillwater Mine, including Noah Dinger;

5) SSL/SMC negligently failed to ensure there were two miners to change the drill steel and/or otherwise operate the Komatsu bolter;

6) SSL/SMC negligently failed to ensure there was signage located at the front jacks of the Komatsu bolter restricting access while the drill is energized;

7) SSL/SMC negligently failed to ensure the Komatsu bolter was equipped with an electronic barrier that will de-energize the Komatsu bolter automatically; and,

8) SSL/SMC negligently failed to ensure that Noah Dinger was properly trained with regard to changing the drill steel and/or otherwise operating the Komatsu bolter.

75.    As a result of SSL's/SMC's negligence outlined above and other negligence, Noah Dinger's clothing became entangled in the drill steel on the Komatsu bolter, and he suffered fatal injuries after surviving an appreciable period of time.

76.    SSL/SMC was solely at fault for negligently causing Noah Dinger's injuries and subsequent death, and Noah Dinger was in no way comparatively

negligent in causing his injuries and subsequent death.

77.     As the duly appointed and acting PR of the Estate of Noah Dinger, Plaintiff is entitled to bring an action for wrongful death pursuant to § 27-1-513, MCA, on behalf of Noah Dinger's heirs for the substantial damages they have and will suffer as a result of his wrongful death.

78.     Noah Dinger's heirs had a very close and loving relationship with him.  The heirs have and will suffer from grief, sorrow, and mental anguish as a result of Noah Dinger's death, and thus they are entitled to wrongful death damages against Defendants SSL and SMC for SSL's and SMC's negligence in causing Noah Dinger's wrongful death.  The full extent of those damages will be proven at the time of trial.

## RELIEF

WHEREFORE, Plaintiff, as the duly appointed and acting PR of the Estate of Noah Dinger, prays for judgment against Defendants SSL and SMC on COUNT I as follows:

a.     For the full amount of wrongful death damages to which the heirs of Noah Dinger are entitled under Montana law;

b.     For all costs and disbursements incurred herein; and,

c.     For such other relief as the Court deems just under the circumstances.

## JURY DEMAND

Plaintiff demands that all issues be tried before a jury on COUNT I.

## COUNT II-SURVIVORSHIP CLAIM AGAINST DEFENDANTS SSL AND SMC BASED ON DIRECT NEGLIGENCE

79.     Plaintiff realleges the allegations contained in ¶¶ 1-78.

80.     Prior to his death on 11/13/23, Noah Dinger lived an appreciable period of time after his clothing became entangled in the drill steel on the Komatsu bolter.

81.     As the duly appointed and acting PR of the Estate of Noah Dinger,

Plaintiff is entitled to bring a survivorship action against Defendants SSL and SMC pursuant to § 27-1-501, MCA, on behalf of the Estate for the damages Noah Dinger suffered as a result of Defendants SSL and SMC's negligence in causing Noah Dinger's death.  The full extent of those damages, which include lost earnings from the time of his injury to his death, the present value of lost earnings and/or loss of earning capacity during Noah Dinger's remaining life expectancy, medical and funeral expenses, conscious pain and suffering, and other special damages, will be proven at the time of trial.

## RELIEF

WHEREFORE, Plaintiff, as the duly appointed and acting PR of the Estate of Noah Dinger, prays for judgment against Defendants SSL and SMC on COUNT II as follows:

    a.    For the full amount of survivorship damages to which the Estate of Noah Dinger is entitled under Montana law;

    b.    For all costs and disbursements incurred herein; and,

    c.    For such other relief as the Court deems just under the circumstances.

## JURY DEMAND

Plaintiff demands that all issues be tried before a jury on COUNT II.

## COUNT III-WRONGFUL DEATH CLAIM BASED ON INHERENTLY DANGEROUS ACTIVITY AGAINST DEFENDANTS SSL AND SMC

82.    Plaintiff realleges the allegations contained in ¶¶ 1-81.

83.    The work Noah Dinger was performing for Moran on 11/13/23, as referenced in detail in ¶¶ 41-43 above, constitutes inherently or intrinsically dangerous activity as a matter of law.

84.    Because the work Noah Dinger was performing for Moran constitutes inherently or intrinsically dangerous activity as a matter of law, pursuant to the Restatement (Second) of Torts § 413, SSL/SMC owed a duty of reasonable care to Noah Dinger even though Noah Dinger was working for Moran at the time of his

injury and subsequent death on 11/13/23 because: 1) SSL/SMC failed to provide in the contract with Moran that Moran shall take such precautions, 2) SSL/SMC failed to exercise reasonable care to provide in some other manner for the taking of such precautions, 3) SSL/SMC failed to ensure that Moran did not allow its employees, including Noah Dinger, to work alone in an area where hazardous conditions exist that endanger his or her safety; and 4) SSL/SMC failed to ensure there were two miners to change the drill steel and/or otherwise operate the Komatsu bolter.

85.     SSL/SMC negligently breached its duty of reasonable care to Noah Dinger, its breach of its duty caused Noah Dinger's wrongful death, and SSL/SMC is liable for its own negligence for all such damages resulting from Noah Dinger's wrongful death, the full extent of which will be proven at the time of trial.

86.     As the duly appointed and acting PR of the Estate of Noah Dinger, Plaintiff is entitled to bring an action for wrongful death pursuant to § 27-1-513, MCA, on behalf of Noah Dinger's heirs for the substantial damages they have and will suffer as a result of his wrongful death.

87.     Noah Dinger's heirs had a very close and loving relationship with him.  The heirs have and will suffer from grief, sorrow, and mental anguish as a result of Noah Dinger's death, and thus they are entitled to wrongful death damages against Defendants SSL and SMC for SSL's and SMC's negligence in causing Noah Dinger's wrongful death.  The full extent of those damages will be proven at the time of trial.

## **RELIEF**

WHEREFORE, Plaintiff, as the duly appointed and acting PR of the Estate of Noah Dinger, prays for judgment against Defendants SSL and SMC on COUNT III as follows:

a.     For the full amount of wrongful death damages to which the heirs of

Noah Dinger are entitled under Montana law;

b.     For all costs and disbursements incurred herein; and,

c.     For such other relief as the Court deems just under the circumstances.

## JURY DEMAND

Plaintiff demands that all issues be tried before a jury on COUNT III.

## COUNT IV-SURVIVORSHIP CLAIM AGAINST DEFENDANTS SSL AND SMC BASED ON INHERENTLY DANGEROUS ACTIVITY

88.     Plaintiff realleges the allegations contained in ¶¶ 1-87.

89.     Prior to his death on 11/13/23, Noah Dinger lived an appreciable period of time after his clothing became entangled in the drill steel on the Komatsu bolter.

90.     As the duly appointed and acting PR of the Estate of Noah Dinger, Plaintiff is entitled to bring a survivorship action against Defendants SSL and SMC pursuant to § 27-1-501, MCA, on behalf of the Estate for the damages Noah Dinger suffered as a result of Defendants SSL and SMC's negligence in causing Noah Dinger's death.  The full extent of those damages, which include lost earnings from the time of his injury to his death, the present value of lost earnings and/or loss of earning capacity during Noah Dinger's remaining life expectancy, medical and funeral expenses, conscious pain and suffering, and other special damages, will be proven at the time of trial.

## RELIEF

WHEREFORE, Plaintiff, as the duly appointed and acting PR of the Estate of Noah Dinger, prays for judgment against Defendants SSL and SMC on COUNT IV as follows:

a.     For the full amount of survivorship damages to which the Estate of Noah Dinger is entitled under Montana law;

b.     For all costs and disbursements incurred herein; and,

c.     For such other relief as the Court deems just under the circumstances.

## **JURY DEMAND**

Plaintiff demands that all issues be tried before a jury on COUNT IV.


DATED this 25th day of June, 2024.


              HOYT & BLEWETT PLLC


              By:    /s/ Drew Blewett
                   Alexander (Zander) Blewett, III
                   Anders Blewett
                   Drew Blewett
                   Attorneys for Plaintiff